# 21-2905

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆━◆

ISABEL LITOVICH, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED, UNITED FOOD AND COMMERCIAL WORKERS UNION AND PARTICIPATING FOOD INDUSTRY EMPLOYERS TRI-STATE PENSION FUND, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, HOLDCRAFT MARITAL TRUST, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, MICHAEL V. COTTRELL, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, FRANK HIRSCH, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellants,*

—against—

BANK OF AMERICA CORPORATION, MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED, BOFA SECURITIES, INC., BARCLAYS CAPITAL INC., CITIGROUP INC., CITIGROUP GLOBAL MARKETS INC., CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK SECURITIES INC., THE GOLDMAN SACHS GROUP, INC., GOLDMAN SACHS & CO. LLC, JPMORGAN CHASE & CO., J.P. MORGAN SECURITIES LLC, MORGAN STANLEY, MORGAN STANLEY & CO. LLC, MORGAN STANLEY SMITH BARNEY LLC, NATWEST MARKETS SECURITIES INC., WELLS FARGO & CO., WELLS FARGO SECURITIES, LLC, WELLS FARGO CLEARING SERVICES, LLC,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (NEW YORK CITY)
NO. 20-3154, HON. LEWIS LIMAN

## JOINT BRIEF FOR DEFENDANTS-APPELLEES

RICHARD C. PEPPERMAN II
MATTHEW J. PORPORA
JONATHAN S. CARTER
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Attorneys for Defendants-Appellees*
*The Goldman Sachs Group, Inc.,*
*and Goldman Sachs & Co. LLC*

ADAM S. HAKKI
RICHARD F. SCHWED
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000

*Attorneys for Defendants-Appellees*
*Bank of America Corporation; BofA*
*Securities, Inc., and Merrill Lynch,*
*Pierce, Fenner & Smith Incorporated*

*(Counsel continued on inside cover)*

Barry G. Sher
Kevin P. Broughel
Paul Hastings LLP
200 Park Avenue
New York, New York 10166
(212) 318-6751

*Attorneys for Defendant-Appellee
Barclays Capital, Inc.*

Herbert S. Washer
Sheila C. Ramesh
Adam S. Mintz
Cahill Gordon & Reindel LLP
32 Old Slip
New York, New York 10005
(212) 701-3000

*Attorneys for Defendant-Appellee
Credit Suisse Securities (USA) LLC*

Robert D. Wick
John S. Playforth
Covington & Burling LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

*Attorneys for Defendants-Appellees
JPMorgan Chase & Co., and J.P.
Morgan Securities LLC*

Paul S. Mishkin
Adam G. Mehes
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

*Attorneys for Defendant-Appellee
NatWest Markets Securities Inc.*

Jay Kasner
Karen M. Lent
Skadden, Arps, Slate,
    Meagher & Flom LLP
One Manhattan West
New York, New York 10001
(212) 735-3276

*Attorneys for Defendants-Appellees
Citigroup Inc. and Citigroup
Global Markets Inc*

John F. Terzaken
Adrienne V. Baxley
Simpson Thacher & Bartlett LLP
900 G Street, NW
Washington, DC 20001
(202) 636-5500

*Attorneys for Defendant-Appellee
Deutsche Bank Securities Inc.*

Richard A. Rosen
Brad S. Karp
Susanna M. Buergel
Paul, Weiss, Rifkind,
    Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

—and—

Kannon K. Shanmugam
Jane B. O'Brien
Paul, Weiss, Rifkind,
    Wharton & Garrison LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300

*Attorneys for Defendants-Appellees
Morgan Stanley, Morgan Stanley
& Co. LLC, and Morgan Stanley
Smith Barney LLC*

Jayant W. Tambe
Laura W. Sawyer
Amanda L. Dollinger
Jones Day
250 Vesey Street
New York, New York 10281
(212) 326-3939

*Attorneys for Defendants-Appellees
Wells Fargo & Co., Wells Fargo
Securities, LLC, Wells Fargo
Clearing Services, LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants-Appellees hereby incorporate by reference their previously filed disclosure statements. *See* ECF No. 92.

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................1

ISSUES PRESENTED...........................................................................................3

STATEMENT OF THE CASE...............................................................................4

    A.    Factual Background............................................................................4

    B.    Plaintiffs' Boycott Claim ..................................................................6

    C.    Procedural History.............................................................................7

SUMMARY OF ARGUMENT ..............................................................................8

ARGUMENT ......................................................................................................12

I.    Plaintiffs Fail to Plead a Plausible Boycott Conspiracy................................12

    A.    Defendants Actively Supported Three Leading Platforms That Offered Transparent and Competitive Prices......................................13

    B.    Plaintiffs Do Not Adequately Allege That Defendants Conspired Against a Single Platform..................................................16

            1.    Plaintiffs' "boycott" allegations are insufficient .....................17

            2.    Plaintiffs' "catch-and-kill" allegations are insufficient ...........22

    C.    Plaintiffs Fail to Plead Parallel Conduct That Raises an Inference of Conspiracy .......................................................................25

            1.    Purportedly parallel investment activity ...................................26

            2.    Purportedly parallel refusals to deal ........................................28

            3.    Purportedly parallel threats and pressure tactics .....................30

    D.    Plaintiffs Fail to Plead "Plus Factors" That Raise an Inference of Conspiracy .......................................................................32

|   |   | 1. | A common interest in higher profits does not suggest conspiracy | 32 |
|   |   | 2. | Defendants' actions were consistent with self-interest | 36 |
|   |   | 3. | Plaintiffs' other plus-factor allegations are meritless | 39 |
| II. |   |   | Plaintiffs Rely on Impermissible Group Pleading | 40 |
| III. |   |   | Plaintiffs' Claim Is Untimely | 46 |
|   | A. |   | Plaintiffs Allege No Overt Boycott Act After April 2016 | 46 |
|   | B. |   | Plaintiffs Fail to Plead Fraudulent Concealment | 50 |
|   |   | 1. | Plaintiffs fail to plead concealment | 50 |
|   |   | 2. | Plaintiffs were on inquiry notice | 52 |
|   |   | 3. | Plaintiffs fail to plead due diligence | 55 |
| IV. |   |   | Plaintiffs Do Not Plead Antitrust Injury | 56 |
| V. |   |   | There Are No Grounds for Vacating the Judgment | 57 |
|   | A. |   | Plaintiffs Have Not Shown a Violation of Section 455 | 58 |
|   | B. |   | Even If Section 455 Was Violated, Vacatur Is Unwarranted | 59 |
| CONCLUSION |   |   |   | 62 |

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*131 Maine St. Assocs.* v. *Manko,*
179 F. Supp. 2d 339 (S.D.N.Y.),
*aff'd,* 54 F. App'x 507 (2d Cir. 2002) ................................................................55

*AD/SAT, Div. of Skylight, Inc.* v. *Associated Press,*
181 F.3d 216 (2d Cir. 1999) .............................................................................41

*Allen* v. *Dairy Farmers of Am., Inc.,*
748 F. Supp. 2d 323 (D. Vt. 2010) ...................................................................52

*Anderson News, L.L.C.* v. *Am. Media, Inc.,*
680 F.3d 162 (2d Cir. 2012) .............................................................................40

*Andrea Theatres, Inc.* v. *Theatre Confections, Inc.,*
787 F.2d 59 (2d Cir. 1986) ...............................................................................49

*Ansul Co.* v. *Uniroyal, Inc.,*
448 F.2d 872 (2d Cir. 1971) .............................................................................49

*Armstrong* v. *McAlpin,*
699 F.2d 79 (2d Cir. 1983) .......................................................................51, 53

*Ashcroft* v. *Iqbal,*
556 U.S. 662 (2009).............................................................................17, 20, 44

*Bell Atl. Corp.* v. *Twombly,*
550 U.S. 544 (2007)...................................................................................*passim*

*Bona Fide Conglomerate, Inc.* v. *SourceAmerica,*
691 F. App'x 389 (9th Cir. 2017) .....................................................................32

*Borger* v. *Yamaha Int'l Corp.,*
625 F.2d 390 (2d Cir. 1980) .............................................................................49

*Brock* v. *Zuckerberg,*
2022 WL 1231044 (2d Cir. 2022) ...............................................................60, 61

*Burtch* v. *Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011) ...............................................................33

*Cap. Imaging Assocs., P.C.* v. *Mohawk Valley Med. Assocs., Inc.*,
  996 F.2d 537 (2d Cir. 1993) ...............................................................40

*Chase Manhattan Bank* v. *Affiliated FM Ins. Co.*,
  343 F.3d 120 (2d Cir. 2003) ...............................................................59

*Concord Assocs., L.P.* v. *Entm't Props. Tr.*,
  2014 WL 1396524 (S.D.N.Y. 2014),
  *aff'd*, 817 F.3d 46 (2d Cir. 2016)........................................................42

*Corcoran* v. *N.Y. Power Auth.*,
  202 F.3d 530 (2d Cir. 1999) .........................................................50, 52

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007) ...........................................................26, 41

*Faulkner* v. *Nat'l Geographic Enters. Inc.*,
  409 F.3d 26 (2d Cir. 2005) ..................................................................61

*Fire & Police Pension Ass'n of Colo.* v. *Bank of Montreal*,
  368 F. Supp. 3d 681 (S.D.N.Y. 2019) .................................................54

*Harry* v. *Total Gas & Power N. Am., Inc.*,
  889 F.3d 104 (2d Cir. 2018) ...............................................................56

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) .........................................................26, 30

*In re Interest Rate Swaps Antitrust Litig.*,
  261 F. Supp. 3d 430 (S.D.N.Y. 2017) .........................................*passim*

*InterVest, Inc.* v. *Bloomberg, L.P.*,
  340 F.3d 144 (3d Cir. 2003) ...............................................................18

*Joseph* v. *Bernstein*,
  612 F. App'x 551 (11th Cir. 2015) ......................................................40

*Klehr* v. *A.O. Smith Corp.*,
  521 U.S. 179 (1997)............................................................................46

*Koch* v. *Christie's Int'l PLC*,
   699 F.3d 141 (2d Cir. 2012) ..................................................50, 51, 55

*Kronisch* v. *United States*,
   150 F.3d 112 (2d Cir. 1998) ...............................................54

*In re Late Fee & Over-Limit Fee Litig.*,
   528 F. Supp. 2d 953 (N.D. Cal. 2007),
   *aff'd*, 741 F.3d 1022 (9th Cir. 2014).....................................33

*LifeWatch Servs. Inc.* v. *Highmark Inc.*,
   902 F.3d 323 (3d Cir. 2018) .............................................33

*Liljeberg* v. *Health Servs. Acquisition Corp.*,
   486 U.S. 847 (1988).......................................................60, 62

*MacNealy* v. *Dayton Osteopathic Hosp., Inc.*,
   1993 WL 1377513 (S.D. Ohio 1993) ................................14

*In re Magnesium Oxide Antitrust Litig.*,
   2011 WL 5008090 (D.N.J. 2011) ................................. 55-56

*Marcus* v. *Smith*,
   755 F. App'x 47 (2d Cir. 2018) .....................................60, 62

*Mayor & City Council of Balt.* v. *Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013) .........................................*passim*

*In re McCarthey*,
   368 F.3d 1266 (10th Cir. 2004) .......................................59

*In re Mexican Gov't Bonds Antitrust Litig.*,
   412 F. Supp. 3d 380 (S.D.N.Y. 2019) ................................42

*Moskovits* v. *Moskovits*,
   150 F. App'x 101 (2d Cir. 2005) .......................................60

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ............................31, 33, 37, 43

*Olean Wholesale Grocery Coop., Inc.* v. *Bumble Bee Foods LLC*,
   No. 19-56514 (9th Cir. Apr. 8, 2022), ECF No. 185.........................57

*Patterson* v. *Mobil Oil Corp.*,
   335 F.3d 476 (5th Cir. 2003) ...............................................................62

*Pearl* v. *Long Beach*,
   296 F.3d 76 (2d Cir. 2002) ..................................................................55

*Poster Exch., Inc.* v. *Nat'l Screen Serv. Corp.*,
   517 F.2d 117 (5th Cir. 1975) ...............................................................47

*SD3, LLC* v. *Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) ...............................................................41

*Singh* v. *Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019) ..................................................................52

*Starr* v. *Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010) ..........................................................19, 20

*In re Travel Agent Comm'n Antitrust Litig.*,
   583 F.3d 896 (6th Cir. 2009) ...............................................................41

*United States* v. *Amico*,
   486 F.3d 764 (2d Cir. 2007) ................................................................60

*United States* v. *Grimm*,
   738 F.3d 498 (2d Cir. 2013) ................................................................47

*US Airways, Inc.* v. *Sabre Holdings Corp.*,
   938 F.3d 43 (2d Cir. 2019) ..................................................................48

*Woori Bank* v. *Merrill Lynch*,
   923 F. Supp. 2d 491 (S.D.N.Y.),
   *aff'd*, 542 F. App'x 81 (2d Cir. 2013)...................................................54

*Zenith Radio Corp.* v. *Hazeltine Research, Inc.*,
   401 U.S. 321 (1971)............................................................................46

*In re Zinc Antitrust Litig.*,
   155 F. Supp. 3d 337 (S.D.N.Y. 2016) ..................................................45

*Zirvi* v. *Flatley*,
   838 F. App'x 582 (2d Cir. 2020) .........................................................53

## Statutes and Rules

28 U.S.C. § 455 .............................................................................*passim*

Fed. R. Civ. P. 9(b) ................................................................11, 50

## Other Authorities

VI Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law
    (5th ed. 2020) .......................................................................36

## INTRODUCTION

Plaintiffs allege an implausible decades-long antitrust conspiracy among nineteen Defendants to boycott electronic trading platforms "that would have increased price transparency and narrowed spreads" for trades of "odd lots" of corporate bonds. Br. 18. The Complaint strings together disparate allegations dating back to the mid-1990s concerning six different platforms, while conceding that Defendants *supported* three platforms that *did* offer "pre-trade pricing transparency" and "better competition on pricing." A107 (¶198). Plaintiffs add a series of statistical analyses purporting to show, at most, that Defendants had a "motive" to maintain high profits, a motive all businesses share.

After two amendments to the pleadings, the district court (Liman, J.) dismissed the Complaint for failure to state a claim. In a thorough, well-reasoned opinion, the court held that (i) the Complaint fails to plead a plausible boycott conspiracy, (ii) the conspiracy allegations against Defendants rest on impermissible group pleading, (iii) Plaintiffs' boycott claim is time-barred, and (iv) Plaintiffs fail to plead antitrust injury. On appeal, Plaintiffs attempt to manufacture legal error by seizing on—and misconstruing—isolated phrases from the court's opinion to argue that the court "assumed facts that helped Defendants" or "chose among plausible inferences." Br. 2, 19-23, 37-46. Plaintiffs also contend that the judgment should be vacated because Judge Liman's wife previously owned stock in one Defendant

(Br. 60-63), even though she sold the stock before the court issued its decision. Both efforts are meritless, and the decision below should be affirmed.

*First*, the district court properly dismissed Plaintiffs' boycott claim for failure to plead any direct evidence, parallel conduct, or "plus factors" raising an inference of conspiracy. Plaintiffs implausibly assert that Defendants spent decades conspiring to boycott "transparent trading platforms" (Br. 18), while supporting three platforms (Bloomberg, MarketAxess, and Tradeweb) that offered transparent and competitive prices. Plaintiffs admit that institutional investors access those three platforms directly and that retail investors access them indirectly through brokers and financial advisors. Plaintiffs thus fail to articulate a coherent distinction between the platforms Defendants allegedly boycotted and those they admittedly supported. Plaintiffs' conclusory boycott allegations are also defective. For the three platforms Defendants supposedly "boycotted," Plaintiffs fail to plead any facts suggesting that any Defendant's decision not to support those startups was the result of a boycott agreement. For the three platforms in which certain Defendants invested, Plaintiffs fail to plead any facts connecting those investments to an agreement to block transparent and competitive trading.

*Second*, the district court correctly concluded that the Complaint "does not contain allegations as to any individual Defendant that would establish" its participation in a group boycott. A235. Plaintiffs instead "refer to Defendants as a

collective bloc" without "connect[ing] any individual Defendant to the alleged conspiracy." A239. That pleading failure is independently fatal to Plaintiffs' claim.

*Third*, the district court rightly held that the four-year statute of limitations bars Plaintiffs' claim. Plaintiffs commenced this action on April 21, 2020, but fail to allege any conspiratorial acts in the four years before that date. The court also properly concluded that the Complaint fails to plead fraudulent concealment.

*Fourth*, the court correctly determined that Plaintiffs fail to plead actual injury caused by the alleged boycott because they do not allege that any of them, or any broker or advisor acting on their behalf, was blocked from trading on any of the three platforms that admittedly offer transparent and competitive prices.

*Fifth*, there are no grounds to vacate the judgment under 28 U.S.C. § 455. Judge Liman's wife divested her stockholding months before the court dismissed the case, and this Court's *de novo* review of that decision will render any recusal failure harmless.

## ISSUES PRESENTED

1. Whether the Complaint adequately pleads direct evidence, parallel conduct, or plus factors raising a plausible inference of a boycott conspiracy.

2. Whether the Complaint adequately pleads facts connecting each individual Defendant to the alleged boycott.

3. Whether Plaintiffs' claim is untimely under the statute of limitations.

4.     Whether the Complaint adequately pleads that Plaintiffs suffered actual injury caused by the alleged boycott.

5.     Whether, notwithstanding this Court's *de novo* review, the judgment should be vacated because Judge Liman's wife previously owned stock in a Defendant that she sold before the court ruled on Defendants' motion.

## STATEMENT OF THE CASE

### A.     Factual Background

Corporate bonds are debt instruments issued through individual offerings. A54 (¶59).  After issuance, corporate bonds are traded "over-the-counter" in the secondary market.  A56 (¶65).  An investor seeking to trade a bond issues a request to one or more dealers, which respond by quoting a price at which they are willing to transact.  A37 (¶6); A57 (¶69).  These requests can be placed by telephone or Bloomberg message or submitted electronically through a trading platform.  A58 (¶72).  Bond trades are categorized by size:  a "round lot" is a trade for an amount greater than and divisible by $1 million in par value, and an "odd lot" is a trade for less than $1 million in par value.  A37 (¶5).  Round-lot trades make up approximately 82% of total trading volume of corporate bonds.  A81 (¶116).

Institutional investors such as pension funds and mutual funds primarily trade in round lots (A62 (¶81)), and individual retail investors typically trade odd lots (A62-63 (¶83)).  Institutional investors are "sophisticated, repeat participants in the

market that maintain longstanding relationships with dealers and are willing and able to shop around for the best pricing." A62 (¶81). They "tend to be better informed than odd-lot or retail investors." *Id.* Because institutional investors are price-sensitive, able to obtain quotes from multiple dealers, knowledgeable about pricing, and potential sources of repeat business, dealers "provide quotes for round lots at their best competitive pricing, keeping their spreads narrow, in the hopes of securing this (and other, future) trades" from the institutional investor. A62 (¶82). By contrast, odd-lot requests "are more likely to involve less sophisticated retail investors." A63 (¶83). Plaintiffs contend that "odd-lot investors in corporate bonds pay average transaction costs" that are greater than what round-lot investors pay. A65-67 (¶¶89-90).

Three trading platforms—Bloomberg, MarketAxess, and Tradeweb—account for 97% of electronic trading of corporate bonds. A107 (¶195). All three platforms "allow investor-to-investor direct trading (without intermediary dealers), and increase pre-trade pricing transparency, which results in better competition on pricing." A107 (¶198). While institutional investors access these platforms directly (A106-07 (¶¶195, 199)), retail investors typically access them through brokers or financial advisors (A43-45 (¶¶22-25); A59 (¶76); A104 (¶¶188-189)). For example, "Tradeweb Direct serves over 45,000 financial advisors at more than 200 retail brokerage and advisory firms," which "provide access to approximately 60,000 retail

clients." SA102. Defendants supported all three of these successful platforms. A106-07 (¶¶195-200).

**B.    Plaintiffs' Boycott Claim**

Plaintiffs are three individuals, a trust, and an institutional investor (UFCW) that traded odd lots of corporate bonds between 2006 and 2020. A43-45 (¶¶22-26). Defendants are among the dozens of dealers engaged in secondary-market trading of corporate bonds. A45-53 (¶¶27-55); A61-62 (¶¶79-80). Plaintiffs allege that Defendants violated Section 1 of the Sherman Act by conspiring to boycott electronic trading platforms that "sought to increase pre-trade pricing transparency, allow all-to-all direct trading and/or anonymous trading, and/or otherwise promote pricing competition for odd-lot investors." A134 (¶279). According to the Complaint, this alleged conspiracy spanned decades and involved six different trading platforms. A89-106 (¶¶136-194).

First, Plaintiffs allege that certain Defendants used their ownership interests in three platforms—Tradeweb, BondDesk, and Trading Edge—to prevent them from offering transparent and competitive prices for odd lots and direct access to retail investors. A91-94 (¶¶ 143-152); A99-108 (¶¶172-203). Second, Plaintiffs allege that Defendants agreed to boycott three startup platforms: (i) the InterVest trading system introduced in the mid-1990s, (ii) the ABS/NYSE Bonds platforms operated by the New York Stock Exchange ("NYSE") since 1976, and (iii) two trading

platforms developed by Bonds.com in 2008 and 2010. A90-91 (¶¶141-142); A95-99 (¶¶153-171).

## C. Procedural History

Plaintiffs filed this action on April 21, 2020. A11. The initial complaint alleged separate conspiracies to fix prices of odd-lot trades (SA75-76 (¶¶237-244)) and to boycott certain electronic trading platforms (SA77-78 (¶¶245-254)). Plaintiffs amended their complaint to add additional plaintiffs (A22) and then amended it again in response to Defendants' first motion to dismiss (A25). On December 15, 2020, Defendants moved to dismiss the second amended complaint ("Complaint"). A25. In opposing that motion, Plaintiffs abandoned their price-fixing claim, thus limiting the case to their boycott claim. A233.

After oral argument on September 9, 2021, the district court dismissed the Complaint on October 25, 2021. A248. The court held that the Complaint fails to (i) plead a plausible boycott conspiracy, (ii) connect any individual Defendant to the alleged conspiracy, (iii) plead a timely claim under the statute of limitations, and (iv) plead antitrust injury. The court dismissed the Complaint with prejudice because "Plaintiffs have not requested leave to amend the Complaint" and "have already amended their complaint once in response to Defendants' first motion to dismiss," which "raised virtually identical arguments." A248 & n.4. Plaintiffs appealed on November 23, 2021. A28.

While this appeal was pending, the Clerk of the District Court informed the parties that a "potential conflict" had been "brought to [Judge Liman's] attention" arising from his wife's prior ownership of stock in a Defendant. SA263. Although "that stock ownership would have required recusal," the parties were told that the stockholding "neither affected nor impacted [Judge Liman's] decisions." *Id.*

Plaintiffs responded by asking this Court to hold this appeal in abeyance while they sought an indicative ruling from the district court that the judgment should be vacated. The Clerk later informed the parties that "the stock holding referenced in [her prior] letter was fully divested in July 2021," approximately two months before oral argument on Defendants' motion to dismiss and three months before the court dismissed the case. SA265. The next day, this Court denied Plaintiffs' request to hold this appeal in abeyance. ECF No. 112.[1]

## SUMMARY OF ARGUMENT

I.A. The district court correctly concluded that Plaintiffs fail to plead a plausible conspiracy. Plaintiffs' boycott theory is facially implausible: they contend that Defendants engaged in a decades-long boycott of platforms that offered transparent and competitive prices for odd lots of corporate bonds, while simultaneously supporting three platforms that offered such prices. Plaintiffs

---

[1] On March 30, 2022, Plaintiffs filed a Rule 62.1 motion for an indicative ruling in the district court, which remains pending. Dist. Ct. Dkt. 160.

concede that institutional investors—which account for 82% of corporate-bond trading by volume—access those three platforms directly and that retail investors access them through "middlemen" such as brokers and financial advisors.

B.  Plaintiffs' allegations regarding the six platforms allegedly targeted by Defendants are defective.  The conclusory allegations that Defendants "boycotted" three platforms—InterVest, ABS/NYSE Bonds, and Bonds.com—are plainly inadequate.  Plaintiffs fail to plead any facts suggesting that Defendants' alleged reluctance to support those startup platforms reflected anything other than the unilateral decision of each Defendant acting in its own self-interest.  It made perfect business sense for each Defendant simply to wait and see whether any of these startup platforms attracted enough support to become successful.  That is particularly true because "[a]lmost all" startup platforms "fail[] within a few years."  A105 (¶191).  The allegations that certain Defendants invested in and co-opted three other platforms—Tradeweb, BondDesk, and TradingEdge—are equally deficient.  Plaintiffs plead no facts suggesting that (i) those investments were the product of a boycott conspiracy, (ii) the three platforms had any plans to allow direct access to retail investors, or (iii) Defendants were responsible for limiting direct access to institutional investors.

C.  Plaintiffs also fail to plead any parallel conduct that raises an inference of conspiracy.  None of the three forms of parallel behavior Plaintiffs posit—parallel

investment activity, parallel refusals to deal, and parallel threats and pressure tactics—raises an inference of a preceding boycott agreement. All three of these alleged behaviors instead are consistent with the type of "independent competitive conduct" that would be expected absent a conspiracy. A203.

D. Nor have Plaintiffs alleged "plus factors" that support an inference of conspiracy. Citing their various statistical analyses that purportedly show wider spreads for odd-lot trades than round-lot trades, Plaintiffs contend that Defendants had a common interest in "seek[ing] profits above those available in a competitive environment." Br. 29. Because an interest in higher profits always exists, however, courts have rejected the suggestion that such a motive provides a meaningful plus factor. Plaintiffs' other plus-factor allegations are equally unpersuasive.

II. The district court correctly held that the Complaint fails to connect "any individual Defendant to the alleged conspiracy" because it relies on group-pleading allegations that treat Defendants as an undifferentiated "collective bloc." A239. The "vast majority" of the few scattered allegations that refer to Defendants individually relate to Defendants' "lawful ownership interests in platforms like TradeWeb and MarketAxess." *Id.* "With regard to the actual boycott activity itself," the Complaint "is almost entirely devoid of allegations about any specific defendant." *Id.*

III.A. The district court correctly concluded that the four-year statute of limitations bars Plaintiffs' claim. Plaintiffs fail to plead any overt acts pursuant to

the alleged boycott agreement in the four years before this action was filed in April 2020.  The district court rightly rejected Plaintiffs' contention that each odd-lot trade after April 2016 at a supposedly inflated price was part of a "continuing violation."  Such trades instead were "merely an effect" of the alleged boycott, which "does not start the statutory period running again."  A241.

B.  Plaintiffs cannot invoke equitable tolling because the Complaint does not allege any of the elements of fraudulent concealment with the particularity required by Rule 9(b).  Plaintiffs fail to plead that Defendants wrongfully concealed facts that prevented Plaintiffs from discovering their claim within the limitations period.  The Complaint's allegations instead establish that Plaintiffs were on inquiry notice of their claim well before April 2016.  Plaintiffs also fail to allege that they exercised diligence in investigating a potential claim.

IV.  Plaintiffs fail to plead any actual injury caused by the alleged boycott.  The Complaint acknowledges that institutional investors, like Plaintiff UFCW, had direct access to "three electronic trading platforms" that "allow investor-to-investor direct trading" and offer "pre-trade pricing transparency" and "better competition on pricing" (A107 (¶198)) and that retail investors, like the other Plaintiffs, had indirect access to those same platforms (A104 (¶¶188-189)).

V.  The judgment should not be vacated under 28 U.S.C. § 455.  Judge Liman's wife divested her stockholding in a Defendant three months *before* the

district court dismissed the case. Nothing in the record suggests that Judge Liman knew of his wife's stockholding when he considered Defendants' motion. Moreover, this Court's plenary review of the district court's decision will render any recusal failure harmless.

## ARGUMENT

### I.    Plaintiffs Fail to Plead a Plausible Boycott Conspiracy.

"A plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed." *Mayor & City Council of Balt.* v. *Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).[2] Where, as here, Plaintiffs allege no direct evidence of a conspiracy, they must "present circumstantial facts supporting the *inference* that a conspiracy existed." *Id.* The "crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 553 (2007).

The Complaint concedes that (i) Defendants supported three electronic trading platforms that offered transparent and competitive prices for odd lots of corporate bonds, (ii) institutional investors access those platforms at will and retail investors access them through brokers and financial advisors, and (iii) the platforms allowed investors to bypass dealers and trade directly with each other. Plaintiffs

---

[2] All internal quotation marks, citations, and alterations are omitted.

nevertheless assert that the same dealers that admittedly supported these trading platforms simultaneously "conspired to stop the development of platforms … that would have increased price transparency" for odd-lot trades. Br. 18. The district court rightly rejected Plaintiffs' allegations as insufficient to sustain an inference of conspiracy.

### A. Defendants Actively Supported Three Leading Platforms That Offered Transparent and Competitive Prices.

Plaintiffs assert a fundamentally implausible conspiracy claim. They accuse Defendants of engaging in a decades-long boycott of platforms that allowed transparent and competitive trading in odd lots of corporate bonds, while simultaneously admitting that Defendants *supported* three thriving platforms that offered such trading. A106-07 (¶¶195, 198). The district court properly recognized that Plaintiffs' allegations that "members of the purported group [boycott] did business with, and did not boycott, platforms that provided" competitive pricing for odd lots fatally undermines their boycott claim. A200. Plaintiffs ignore this fatal flaw in their boycott theory.

Plaintiffs admit that Defendants supported electronic platforms operated by Bloomberg, MarketAxess, and Tradeweb that (i) offer odd-lot trading (A107 (¶199)), (ii) "allow investor-to-investor direct trading" (A107 (¶198)), and (iii) provide "pre-trade pricing transparency, which results in better competition on pricing" (*id.*). If Defendants were actually conspiring to boycott platforms that

offered "price transparency and narrowe[r] spreads for odd-lot bond trades" (Br. 18), it would make no sense for them to support these three successful platforms. "It simply is not reasonable to infer that the Defendants engaged in a group boycott" to "drive [some] competitor[s]" from "the marketplace when, after doing so, they allowed other competitors into that market." *MacNealy* v. *Dayton Osteopathic Hosp., Inc.*, 1993 WL 1377513, at *9 (S.D. Ohio 1993).

Plaintiffs cannot reconcile their boycott theory with Defendants' support for Bloomberg, MarketAxess, and Tradeweb. Plaintiffs originally suggested that Defendants targeted platforms that allowed direct access to retail investors and exempted Bloomberg, MarketAxess, and Tradeweb from the purported boycott because retail investors access those platforms indirectly through "middlemen" like brokers and financial advisors. A104 (¶¶188-189); A106-08 (¶¶195-203). In their opposition to Defendants' motion to dismiss, however, Plaintiffs "expressly disavow[ed]" any intent to plead a boycott directed at platforms that permitted direct retail-investor access. A200. Instead, Plaintiffs insisted that they allege a broader conspiracy "designed to maintain pricing opacity for odd-lot corporate bonds, whether they were bought or sold by retail or institutional investors, and regardless of how those odd-lot investors accessed" trading platforms. Dist. Ct. Dkt. 133 at 31.

It is unclear whether Plaintiffs seek to revive on appeal their discarded focus on "retail investors," but any such effort would be meritless as well as untimely.

First, the Complaint contains no well-pled allegations that the startup platforms allegedly targeted by Defendants offered or planned to offer direct access to retail investors. *See* A200. Second, Plaintiffs do not—and cannot—allege that most retail investors are even *capable* of directly accessing and trading on electronic trading platforms. Third, a boycott conspiracy focused on retail investors would make little sense because institutional investors account for the vast majority of corporate-bond trading. A68 (¶93). Finally, the Complaint lacks any non-conclusory allegations that *Defendants* are responsible for retail investors' lack of direct access to Bloomberg, MarketAxess, and Tradeweb. Although Plaintiffs vaguely allege that those platforms have "significant relationships" with Defendants (A107 (¶195)), they plead no facts indicating that Defendants controlled those platforms or their decisions on retail-investor access. Nor could they. Defendants never had any ownership interest in Bloomberg; MarketAxess has long been independently owned and operated;[3] and Tradeweb has been majority owned by Thomson Reuters since 2004. A93-A94 (¶¶149-151); A107 (¶196).

Having discarded their retail-investor theory in the district court, Plaintiffs shift much of their emphasis on appeal to the claim that "Defendants conspired to

---

[3] Although JPMorgan's asset-management business allegedly held 17.5% of MarketAxess's shares as of 2011 (A106 (¶193)), that business is separate from JPMorgan's corporate-bonds trading desk, and there are no allegations of any ownership interest after 2011.

boycott all-to-all electronic trading sites" (Br. 25), but that claim is equally defective. The Complaint contains no well-pled allegations that most of the platforms allegedly targeted by Defendants ever offered or planned to offer all-to-all trading—*i.e.*, to allow investors to bypass dealers and trade directly with each other. *See infra* Argument I.B. By contrast, Bloomberg, MarketAxess, and Tradeweb *do* "allow investor-to-investor direct trading (without intermediary dealers)." A107 (¶198). Plaintiffs thus are reduced to equivocating about the goal of the alleged conspiracy, often suggesting that it focused not on all-to-all trading, but on platforms "that would have increased price transparency" (Br. 18) and on preserving an "opaque market" (Br. 41) without explaining what that means. Defendants' support for Bloomberg, MarketAxess, and Tradeweb—all of which offered transparent and competitive prices as well as direct investor-to-investor trading—is antithetical to such a conspiracy.

## B. Plaintiffs Do Not Adequately Allege That Defendants Conspired Against a Single Platform.

The Complaint's allegations that Defendants conspired to "boycott" three platforms and "catch-and-kill" three others (Br. 11-16) are insufficient to satisfy *Twombly*'s pleading standard.

### 1. Plaintiffs' "boycott" allegations are insufficient.

The district court correctly held that Plaintiffs' allegations fail to plead a plausible conspiracy to "boycott" InterVest, ABS/NYSE Bonds, and Bonds.com, whether considered individually or collectively. A210-16.

**InterVest**. In two conclusory paragraphs, Plaintiffs allege that Defendants conspired in the mid-1990s to obstruct InterVest's electronic trading system for bonds. A90-91 (¶¶141-142). According to the Complaint, InterVest "struck a deal with Bloomberg to provide its system on Bloomberg terminals," but Bloomberg terminated this arrangement in 1998 after unidentified "bond dealers" allegedly "began to complain." *Id.* Those allegations suffer from three principal defects.

First, Plaintiffs plead no *facts* indicating that any Defendant conspired against InterVest. Although Plaintiffs allege that unidentified dealers "complain[ed]" and vaguely assert that "Bloomberg terminated the service" due to "pressure from Defendants" (A91 (¶142)), the Complaint "does not include any specific allegations regarding this pressure, who specifically applied it, [or] how it was applied" (A192). Nor does the Complaint identify "a single Defendant who complained or a single complaint that was made to Bloomberg." A214. Plaintiffs' conclusory assertions "are not entitled to the assumption of truth." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 679 (2009).

Second, Plaintiffs fail to distinguish InterVest from the platforms Defendants supported. They do not allege, for example, that InterVest offered all-to-all trading or granted direct access to retail investors, instead offering only a vague allegation that the InterVest "system promised anonymous, push-button trading." A90 (¶141).

Third, InterVest litigated and lost the same conspiracy claim in *InterVest, Inc.* v. *Bloomberg, L.P.*, 340 F.3d 144 (3d Cir. 2003). There, the Third Circuit affirmed a grant of summary judgment dismissing InterVest's claim that certain dealers boycotted it, reasoning that evidence that dealers had complained about InterVest, "without any other supporting evidence tending to show illegal pressure or a conspiracy, is insufficient." *Id.* at 166, 168. Likewise here, a bare assertion that unidentified dealers "complain[ed]" about InterVest (A90 (¶142)) is insufficient.

**ABS/NYSE Bonds**. Plaintiffs allege that NYSE launched a corporate bonds trading platform known as "ABS" in 1976 and then replaced it with a platform called "NYSE Bonds" in 2007. A95 (¶¶153-156). ABS and NYSE Bonds allegedly failed to achieve substantial market share at any time in their 46-year history. *Id.* Although Plaintiffs allege that these platforms failed because of "a concerted boycott" by "Defendants" (A96 (¶157)), the district court correctly held that those conclusory allegations do not satisfy *Twombly* (A211). As the court recognized, the ABS/NYSE Bonds allegations refer to "Defendants" only in generic terms, fail to plead any facts supporting Plaintiffs' bald assertion of a "boycott," and fail to allege "that any

Defendant declined to participate on the platform." A211. Indeed, Plaintiffs acknowledge that "25 bond dealers" participate in "NYSE Bonds" and do not identify a single Defendant that is not among those 25. A95-96 (¶156). The Complaint also fails to distinguish ABS/NYSE Bonds from the platforms Defendants supported.

Although Plaintiffs tout their allegation that it took "18-19 months" to connect NYSE Bonds to Bloomberg's trade management system when it supposedly should have taken only five months (Br. 15; A97 (¶162)), the Complaint never explains how that 14-month delay in 2007 is somehow responsible for the platform's failure to achieve substantial market penetration at any time in its 46-year history. Moreover, Plaintiffs' own allegations undermine their vague assertion that Defendants "used their market power and value to Bloomberg" to "force Bloomberg to materially delay NYSE Bonds' connection." A97 (¶163). According to the Complaint, Bloomberg is a monopolist that Defendants were in no position to coerce: its trade management system is allegedly an "essential facility" that "[e]veryone trading corporate bonds electronically, *including Defendants*, must use." A96-97 (¶¶160-163) (emphasis added).

Citing *Starr* v. *Sony BMG Music Entertainment*, 592 F.3d 314 (2d Cir. 2010), Plaintiffs counter that they have no obligation to plead a single time, place, or person allegedly involved in boycotting ABS/NYSE Bonds. Br. 44-46. But *Starr* does not

relieve an antitrust plaintiff of the obligation to plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement," *Twombly*, 550 U.S. at 556, which often requires identification of at least some "specific time, place, or person involved in the alleged conspirac[y]," *id*. at 565 n.10. In *Starr*, the plaintiffs satisfied that requirement by pleading seven specific forms of parallel conduct that adequately identified the alleged agreement among the defendants. *See* 592 F.3d at 323-25. Here, by contrast, Plaintiffs provide no "well-pleaded, nonconclusory *factual* allegation of parallel behavior" relating to ABS/NYSE Bonds, *Iqbal*, 556 U.S. at 680, let alone allegations sufficiently specific to overcome their inability to identify a single time, place, or person involved in the supposed boycott.

**Bonds.com**. Bonds.com allegedly launched a trading platform in 2008 that was open to both retail and institutional investors, but "refocused" on institutional investors three months later "due to market conditions and other economic factors." A98 (¶167); Br. 15-16. In 2010, Bonds.com "shifted to a platform called BondsPro," which also focused on "professional traders and large institutional investors." A98 (¶168). "Between 2012 and 2013, Bonds.com sought order flow" from "major corporate bond dealers like Defendants," but allegedly found no takers. A99 (¶¶169-170).

Plaintiffs wholly fail to distinguish Bonds.com from the platforms Defendants supported. Although Plaintiffs allege that Bonds.com allowed "all-to-all" trading "that would eliminate Defendants as middlemen" (A99 (¶168)), Bloomberg, MarketAxess, and Tradeweb similarly "allow investor-to-investor direct trading (without intermediary dealers)" (A107 (¶198)). Moreover, although "major corporate bond dealers" allegedly declined to participate on Bonds.com in 2012 and 2013, "each Dealer's [alleged] decision to avoid [this] startup platform[], like the decision by each phone company in *Twombly* not to compete in new markets, is, in and of itself, unremarkable." *In re Interest Rate Swaps Antitrust Litig.* ("*IRS*"), 261 F. Supp. 3d 430, 475 (S.D.N.Y. 2017). Plaintiffs acknowledge that "[a]lmost all" startup platforms fail within a few years (A105 (¶191)), and they further admit that three thriving electronic platforms already existed (A107-08 (¶¶198-203)). Under these circumstances, the mere allegation that dealers did not flock to a startup platform, without more, "is not—at all—suggestive of conspiracy." *IRS*, 261 F. Supp. 3d at 475.

Plaintiffs emphasize their allegation that Bank of America stated that it would be willing to participate on Bonds.com if "at least one or two of the larger dealers (such as Morgan Stanley or JPMorgan) also participated" (A99 (¶170)), but it is entirely natural and predictable that Bank of America would be reluctant to join a fledgling startup platform unless other major market participants were doing so

(A213). Furthermore, the Complaint does not allege that Morgan Stanley, JPMorgan, or any other Defendant expressed a similar position. Rather, it cites Morgan Stanley and JPMorgan only as parenthetical illustrations of the type of dealers Bank of America allegedly had in mind in referring to "larger dealers." A99 (¶170). As the district court held, the "unilateral expression of one market participant" regarding its conditions for joining a startup platform provides no plausible basis for inferring "a preexisting agreement not to compete." A213.

### 2. Plaintiffs' "catch-and-kill" allegations are insufficient.

Plaintiffs also allege that certain Defendants invested in Tradeweb, BondDesk, and Trading Edge and then used those investments to prevent those platforms "from making the odd-lot bond market more efficient." Br. 11. None of these allegations implicates Defendants in an antitrust conspiracy.

**Tradeweb**. Plaintiffs allege that in 1996 and 2008, certain Defendants invested in and provided liquidity to Tradeweb in exchange for minority ownership stakes. A91 (¶143); A93-94 (¶¶149-151). Plaintiffs concede that there were rational business reasons for these investments: having an equity stake in Tradeweb was "a way of replacing money" that dealers "made on market-making" but that would be "lost" when the market went "electronic." A92 (¶148).

Plaintiffs nevertheless assert that Defendants used their minority ownership interests to direct Tradeweb to maintain "the status quo" and "complete opacity" in

the market. A91-92 (¶¶145-146). But Plaintiffs' own factual allegations contradict those conclusory assertions: Tradeweb admittedly "allow[s] investor-to-investor direct trading (without intermediary dealers)," increases "pre-trade pricing transparency," and promotes "greater competition on pricing for odd-lots of corporate bonds." A107 (¶198); A108 (¶203). The district court thus correctly held that "Plaintiffs' factual allegations [about Tradeweb] undermine their own theory." A209.

Plaintiffs' Tradeweb allegations here are even weaker than the similar Tradeweb allegations that were rejected in *IRS*. The *IRS* plaintiffs alleged that certain defendants used their minority investments in Tradeweb to stop it from offering all-to-all trading of interest rate swaps. 261 F. Supp. 3d at 466. The court rejected those allegations because the plaintiffs failed to allege any facts "supporting [their] critical background premise—that Tradeweb ever had … a plan" to offer all-to-all trading of interest rate swaps. *Id*. As the district court recognized in this case, "[t]he same result follows here." A210. Plaintiffs "do not allege that Tradeweb ever considered opening its platform to retail odd-lot investors whether before or after Defendants' investment," nor do they allege that Tradeweb ever considered any form of trading different from the all-to-all trading it already offers. A209. "Thus, Plaintiffs do not allege the existence or prospect of any retail all-to-all platform for Defendants to 'catch and kill.'" *Id*.

**BondDesk**. BondDesk was independently owned and operated from 1999 to 2013, except for a two-year period from 2004 to 2006 when four Defendants allegedly held an ownership interest in the platform. A99-103 (¶¶172-186). BondDesk "catered to investment advisors representing retail investors, but it was *not* directly open to retail clients." A100 (¶172) (emphasis added). In 2013, Tradeweb acquired BondDesk for $200 million. A103 (¶186). After the acquisition, Tradeweb continued to offer retail investor access to the platform through "middlemen," including "every financial adviser" at the leading retail brokerage firms. A104 (¶¶188-189).

Although Plaintiffs assert that Defendants used Tradeweb to "catch-and-kill" the BondDesk platform (Br. 33-34), the platform has been highly successful since Tradeweb acquired it, accounting for one in seven corporate-bond trades (A104 (¶189)). Plaintiffs also fail to distinguish BondDesk from the platforms Defendants supported—which, unlike BondDesk, even offer direct investor-to-investor trading. Plaintiffs suggest that after acquiring BondDesk, Tradeweb "limited access to institutional investors" (Br. 14), but that suggestion is undone by Plaintiffs' admissions that retail investors can access the platform indirectly and that, "[f]rom its inception," BondDesk "was not directly open to retail clients." A100 (¶172). In addition, the Complaint contains no non-conclusory allegations that any of the *Defendants* were responsible for Tradeweb's decisions regarding BondDesk.

**Trading Edge**.  Plaintiffs briefly allege that MarketAxess acquired an electronic platform called Trading Edge in 2001 and later terminated its anonymous trading protocol (A106 (¶¶193-194)), but the Complaint contains no factual allegations that Defendants colluded against Trading Edge, that they caused MarketAxess to acquire Trading Edge, or that Trading Edge offered odd-lot trading. The decades-old Trading Edge allegations thus have no relevance here.  *See* A238.

## C. Plaintiffs Fail to Plead Parallel Conduct That Raises an Inference of Conspiracy.

Plaintiffs do not argue that their allegations about any of the six platforms supposedly targeted by Defendants alone are sufficient to plead a conspiracy. Rather, they contend that their allegations taken together depict three forms of loosely parallel behavior:  parallel investment activity, parallel refusals to deal, and parallel threats and pressure tactics.  Br. 27-28.  Plaintiffs assert that this "parallel conduct" justifies an inference of a preexisting agreement to prevent competitive trading of odd lots, and erroneously suggest that the district court only considered "each type of alleged parallel conduct separately."  Br. 19.  In fact, the district court correctly rejected Plaintiffs' allegations because, "whether analyzed in isolation or holistically," all of the alleged behavior is consistent with the type of "independent competitive conduct" that would be expected absent a conspiracy.  A203.

In *Twombly*, the Supreme Court held that no inference of conspiracy should be drawn from "parallel conduct that could just as well be independent action."  550

U.S. at 557. Courts thus decline to infer an antitrust conspiracy where the alleged parallel behavior "made perfect business sense," *Citigroup*, 709 F.3d at 138, where the allegations "suggest competition at least as plausibly" as "conspiracy," *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007), or where "there are obvious alternative explanation[s]" for the parallel conduct, *Twombly*, 550 U.S. at 567; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322-23 (3d Cir. 2010). Applying those principles, the district court correctly held that Plaintiffs' parallel-conduct allegations are "not suggestive of a preexisting agreement." A203.

### 1. Purportedly parallel investment activity

Plaintiffs observe that (i) JPMorgan invested in MarketAxess in 2001, (ii) four Defendants had minority investments in BondDesk from 2004 to 2006, and (iii) certain Defendants invested in Tradeweb in 1996, 2004, and 2008. Br. 27 (citing A91-94 (¶¶143-152); A99-104 (¶¶172-189); A106-07 (¶¶193-195)). Plaintiffs assert that this "parallel" investment activity was designed to "ensure that those platforms do not introduce price competition for odd-lot trades" (Br. 27), but they admit that those platforms *did* introduce such price competition. Specifically, the Complaint alleges that MarketAxess and Tradeweb (which acquired BondDesk) "allow investor-to-investor direct trading" and "increase pre-trade pricing transparency, which results in better competition on pricing." A107 (¶198). The

district court thus correctly held that Defendants' alleged parallel investment activity at most "is lawful parallel conduct that fails to bespeak unlawful agreement." A207.

Although Plaintiffs fault Tradeweb for not doing more to "improve how bonds are presented to retail customers" after acquiring BondDesk (Br. 44), Tradeweb operated the BondDesk platform the same way it had been operated before the acquisition, and the platform (now called Tradeweb Direct) has been highly successful (A104 (¶189)). Tradeweb's decision not to alter the platform in the way Plaintiffs would have liked provides no basis for inferring an antitrust conspiracy. *See Twombly*, 550 U.S. at 569 ("[F]irms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets.").

More broadly, the district court rightly concluded that Tradeweb's decisions about how to operate its trading platform are not allegations of "parallel conduct," but rather reflect "the activity of a single joint venture." A208. Plaintiffs counter that, if Tradeweb acted merely as a "formalistic shell for ongoing concerted action," its conduct could "constitute concerted action." Br. 43. But Plaintiffs plead no facts suggesting that Tradeweb was "an illegitimate shell that offered no efficiency enhancements and served only to mask concerted conduct." *IRS*, 261 F. Supp. 3d at 468 & n.17. And, even if Plaintiffs were correct that Tradeweb's decision not to alter the platform could be deemed "concerted" rather than unilateral action, the

district court correctly held that Tradeweb's decision *still* would not provide the type of "simultaneous, similar conduct of competitors" that sometimes raises an inference of conspiracy. A208; *see also IRS*, 261 F. Supp. 3d at 486 ("Tradeweb's not having adopted anonymous all-to-all IRS trading would not, without more, give rise to an inference of participation in a conspiracy.").

## 2. Purportedly parallel refusals to deal

Plaintiffs next assert that "Defendants" complained to Bloomberg about InterVest and refused to do business with ABS/NYSE Bonds and Bonds.com. Br. 27-28. But the Complaint lacks well-pled factual allegations indicating that any individual Defendant, in fact, refused to do business with or complained about those platforms. Moreover, the Complaint's group-pleading allegations that "Defendants" colluded against those platforms make no sense given that there are no allegations that ABS/NYSE Bonds or InterVest allowed either direct access to retail investors or all-to-all trading that bypassed dealers.

Even setting those defects aside, the district court correctly held that this alleged parallel behavior "is not suggestive of a pre-existing agreement." A203-04. Plaintiffs admit that almost all startup platforms quickly fail (A105 (¶191)), and they allege that the startups Defendants purportedly declined to support posed a competitive threat to Defendants (A39-40 (¶13); A41 (¶15); A86 (¶131); A100 (¶175)). Accepting those allegations as true, "each Dealer's [alleged] decision to

avoid the startup platforms … is, in and of itself unremarkable.  Considered alone, it is not—at all—suggestive of conspiracy."  A213 (quoting *IRS*, 261 F. Supp. 3d at 475).

*Twombly* illustrates these principles.  There, the plaintiffs alleged that the defendants engaged in parallel acts of resistance, obstruction, and "sabotage" designed to prevent startup firms from competing with them.  *See* 550 U.S. at 550-51, 566.  Although the plaintiffs argued that the parallel resistance to the startups justified an inference of a preceding agreement, the Supreme Court held that the allegations failed to sustain an inference that the resistance "was anything more than the natural, unilateral reaction" of each defendant to the startups.  *Id.* at 566.  As the Court explained, the alleged parallel acts of resistance provided "no reason to infer that the [defendants] had agreed among themselves to do what was only natural anyway; so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a §1 violation against almost any group of competing businesses would be a sure thing."  *Id.*  The same reasoning applies here:  each Defendant's alleged decision to avoid the ABS/NYSE Bonds, Bonds.com, and InterVest platforms was "only natural anyway" and provides no basis for inferring a conspiracy.

Plaintiffs complain that the district court improperly refused to infer a conspiracy from these allegations "because it found other inferences more plausible"

(Br. 20), but that is incorrect. Although the court referred at times to inferences it found "more plausible" than certain inferences urged by Plaintiffs (A210; A223-24), it did *not* conclude that an inference of conspiracy was plausible and then reject that inference because it found an inference of non-conspiracy more plausible. Instead, the language cited by Plaintiffs simply reflects the settled principle that no inference of conspiracy should be drawn in the first place from conduct that "could just as easily turn out to have been rational business behavior," *Citigroup*, 709 F.3d at 137, that "could just as well be independent action," *Twombly*, 550 U.S. at 557, or that is "just as much in line" with "rational and competitive business strategy unilaterally prompted by common perceptions of the market," *id*. at 554. In other words, the alternative inferences cited by the district court provide "obvious" or "natural" non-conspiratorial explanations for the challenged conduct that bar a plausible inference of conspiracy. *See Twombly*, 550 U.S. at 567-68; *In re Ins. Brokerage*, 618 F.3d at 322-23.

### 3.     Purportedly parallel threats and pressure tactics

Plaintiffs cite three sets of allegations to support their assertion that Defendants engaged in parallel threats and pressure tactics: (i) in the 1990s, Salomon Smith Barney allegedly refused to trade with certain InterVest traders, (ii) in 2012 or 2013, Bank of America allegedly expressed concern about participating on Bonds.com due to potential "blowback" from "other Defendants,"

and (iii) at unidentified times between 2015 and 2019, Citibank and Morgan Stanley each allegedly threatened to limit its business with First Tennessee if First Tennessee continued to compete aggressively for BlackRock's business.  Br. 28 (citing A89-90 (¶¶137-140); A99 (¶170)).

Those allegations "barely" plead any parallel conduct at all, let alone parallel conduct suggestive of a decades-long antitrust conspiracy.  A216-17.  First, the three incidents alleged by Plaintiffs are too narrow, disparate, and disconnected to raise a plausible inference of a preceding agreement among all Defendants to engage in the challenged conduct.  *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) (similar conduct widely separated in time "does not raise the specter of collusion").  Second, Plaintiffs' allegation that two Defendants had a narrow dispute with First Tennessee over BlackRock's business has no connection to Plaintiffs' theory that all nineteen Defendants conspired to boycott electronic trading platforms.  Third, Plaintiffs' allegation that "one isolated Defendant" made "one isolated comment" about its reluctance to join Bonds.com does not plead parallel conduct given the absence of any allegations of similar statements by other Defendants.  A216.  Without any well-pled allegation of parallel conduct, Bank of America's alleged fear of some unspecified form of "blowback" is far too slender a reed on which to base a massive antitrust conspiracy.

At most, Plaintiffs allege "parallel decisions to resist competition" that are "only natural anyway." *Twombly*, 550 U.S. at 566. "Each dealer individually would have an interest in a competitor not taking market share from it." A215. Plaintiffs' allegations of episodic acts that "could just as easily turn out to have been rational business behavior" thus raise no inference of conspiracy. *Citigroup*, 709 F.3d at 137.

### D. Plaintiffs Fail to Plead "Plus Factors" That Raise an Inference of Conspiracy.

The district court correctly held that Plaintiffs' various plus-factor allegations fail to salvage their conspiracy claim. A217-34. Indeed, given the weakness of the Complaint's parallel-conduct allegations, it is doubtful that any combination of plus factors could sustain an inference of conspiracy here. *See, e.g., Bona Fide Conglomerate, Inc.* v. *SourceAmerica*, 691 F. App'x 389, 391 (9th Cir. 2017) ("'Plus factors' are relevant only if the complaint adequately alleges parallel conduct among the defendants."); *Citigroup*, 709 F.3d at 137 ("[E]ven if a plaintiff alleges additional factors or circumstances—what we have previously called 'plus factors'—these facts must still lead to an inference of conspiracy.").

### 1. A common interest in higher profits does not suggest conspiracy.

Plaintiffs argue that Defendants share "an incentive to seek profits above those available in a competitive market." Br. 29. But courts have rejected the suggestion

that a common interest in higher profits supports an inference of conspiracy because such an interest "always exists." *In re Musical Instruments*, 798 F.3d at 1194 n.8. All firms in all markets "have a legitimate understandable motive to increase profits," and consequently, "this motive does not on its own constitute evidence of a 'plus factor.'" *Burtch* v. *Milberg Factors, Inc.*, 662 F.3d 212, 229 (3d Cir. 2011). Indeed, "if a motive to achieve higher [profits] were sufficient, every company in every industry could be accused of conspiring because they all would have such a motive." *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014); *see also LifeWatch Servs. Inc.* v. *Highmark Inc.*, 902 F.3d 323, 335 n.7 (3d Cir. 2018) ("Defendants' shared goal to save costs and increase profits" is "not a plus factor establishing an agreement without further evidence of concerted, collusive conduct.").

Plaintiffs nonetheless assert that the Complaint alleges that "Defendants earned supracompetitive profits, creating a common motive to conspire." Br. 29. But allegations of high profits alone are not suggestive of conspiracy, and each of Plaintiffs' contentions suffers from other independent defects.

First, Plaintiffs contend that wider spreads for odd-lot trades versus round-lot trades reflect "supracompetitive odd-lot pricing." Br. 30. As the district court recognized, however, "the Complaint itself provides specific and detailed allegations outlining why" dealers would "offer better pricing to investors trading in round lots."

A221.  According to the Complaint, Defendants' costs for executing trades are "the same whether the Defendants are dealing in [smaller] odd-lots or [larger] round lots."  A119 (¶232).  These fixed trading costs can be spread "over a larger lot of bonds" when trading in round lots, resulting in narrower spreads for round lots than odd lots.  A221.  The Complaint further alleges that odd-lot trades "more likely" involve "less sophisticated retail investors" who "typically trade infrequently," while round-lot trades "almost always involve institutional investors" that are "repeat participants in the market" and "willing and able to shop around for the best pricing."  A62-63 (¶¶81-83).

Seizing on the district court's isolated use of the phrase "market power" in discussing those allegations, Plaintiffs assert that "[n]othing in the Complaint alleges that institutional investors have market power."  Br. 38.  But Plaintiffs ignore what the Complaint *does* allege, which explains the disparity between odd-lot and round-lot prices:  the Complaint states that "dealers provide quotes for round lots at their best competitive pricing" because they "know that they are dealing with an institutional investor that is likely to be:  (a) price sensitive; (b) willing and able to obtain multiple quotes from other dealers; (c) knowledgeable regarding the market and pricing due to their repeated role in trading; and (d) in control of large portfolios of bonds that offer additional trading opportunities if the dealer is competitive in its

pricing." A62 (¶82). Those allegations defeat Plaintiffs' claim that the alleged pricing disparity raises an inference of conspiracy.

Second, Plaintiffs similarly contend that their statistical analyses show that odd-lot spreads are wider than round-lot spreads on both Defendants' trades and so-called "Riskless Principal Trades." Br. 30. But these allegations do not plead a plausible boycott conspiracy either. As an initial matter, Plaintiffs' analyses purport to show average spreads over a 13-year period, which masks all variations over time. A68-79 (¶¶95-112). Plaintiffs also fail to connect their analyses to their boycott theory as opposed to their abandoned price-fixing theory, and their own Complaint (A62-63 (¶¶81-85)) undermines their assertion that "[a] competitive market would not have such differences" (Br. 30). The district court thus rightly concluded that these allegations show "nothing other than what one would expect from the natural operation of market forces"—prices are lower for institutional investors trading in round lots. A222.

In addition, Plaintiffs never attempt to reconcile their assertion "that Defendants' spreads on odd-lot trades are wider than those of non-Defendant[s]" (Br. 30) with the Complaint's allegation that the purported boycott affected "overall pricing in the market," allowing "non-Defendants to increase [their] prices" too (A78 (¶112)). Plaintiffs do not explain why an alleged boycott that supposedly affected

"overall pricing" purportedly enabled Defendants to charge wider spreads than other dealers.

Finally, Plaintiffs contend that "the U.S. odd-lot market behaves differently from contemporary international markets and the historical U.S. market." Br. 30. But the studies of corporate-bond trading in Israel and Italy cited in the Complaint did not find that odd-lot and round-lot spreads are identical in those countries, and they nowhere suggest that Defendants share a common motive to participate in a boycott conspiracy in the United States. A82-85 (¶¶119-126). Plaintiffs' assertion that "the costs of trading odd lots and round lots were essentially the same" in "the United States before World War II" (Br. 31) only underscores that the pricing disparity on which Plaintiffs predicate their entire case has existed for over 75 years, negating any inference that it arises from a comparatively recent antitrust conspiracy.

## 2. Defendants' actions were consistent with self-interest.

Plaintiffs argue that all three types of parallel behavior they attribute to Defendants—refusals to deal, investments in platforms, and threats and pressure tactics—were contrary to Defendants' self-interest absent a boycott conspiracy. Br. 31-34. But "an action contrary to self-interest is not merely a different judgment than an armchair observer would have made looking at the same factors." VI PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶1414 (5th ed. 2020). "Rather, it must be an action that is so irrational that no firm would have engaged in

it except on the understanding that others were in agreement." *Id.*; *see also In re Musical Instruments*, 798 F.3d at 1195 (conduct contrary to self-interest occurs "where individual action would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement"). Plaintiffs come nowhere near pleading such conduct.

**Refusals to deal**. Plaintiffs contend that Defendants acted contrary to their self-interest by declining to participate in "all-to-all odd-lot trading" (Br. 32), but the Complaint never alleges that all-to-all trading was available on most of the platforms Defendants purportedly targeted. The Complaint also identifies several reasons why there was nothing irrational about declining to trade on the platforms at issue. First, almost all startup platforms fail within a few years. A105 (¶191). Second, Defendants already were supporting three thriving platforms that offered direct investor-to-investor trading. A107 (¶198). Third, Defendants allegedly liked the market the way it was and supposedly viewed the new entrants as potential competitive threats. A86 (¶131). Under those circumstances, there was nothing irrational about each Defendant unilaterally deciding to support three electronic trading platforms rather than four or more, and it "made perfect business sense," *Citigroup*, 709 F.3d at 138, for each simply to wait and see whether any additional platforms attracted enough support to become successful. *See* A203-05; A213.

Plaintiffs speculate that Defendants would have been better served to "move first" to join startup platforms before others did (Br. 32-33), but that speculation ignores that Defendants *already* had moved to support three other successful trading platforms (A91 (¶143); A107 (¶195)). Plaintiffs also assert that Defendants risked losing market share by waiting to join startup platforms (Br. 32), but by that logic, Defendants should have immediately thrown themselves at all 89 startup platforms that failed to succeed in this market over the years (A105 (¶191)). There was nothing unduly risky or irrational about taking a wait-and-see approach. *See Twombly*, 550 U.S. at 568 (declining to infer conspiracy where defendants "doubtless liked the world the way it was" and presumably were "sitting tight, expecting their neighbors to do the same thing"). Finally, focusing on a single sentence in the court's opinion, Plaintiffs argue that the district court incorrectly inferred that "no platform could be successful without the participation of all or most of the dealers." Br. 42 (quoting A204). That sentence not only was unimportant to the court's ruling, but also is supported by the allegations that ABS/NYSE Bonds failed despite participation of 25 dealers (A95-96 (¶156)), that Tradeweb needed the liquidity provided by Defendants (A94 (¶151)), and that all three successful platforms have participation of all Defendants (A106-07 (¶195)).

**Platform investments**. Plaintiffs next assert (Br. 33) that four Defendants acted contrary to their individual interests when they allegedly invested in BondDesk

in 2004 (A100 (¶173)), changed its management (A100 (¶176)), and then sold their interests to a private equity firm in 2006 (A101-02 (¶182)). But Plaintiffs' own allegations refute that assertion. The Complaint acknowledges that the 2006 sale price for BondDesk (well over $200 million) was highly favorable, much higher than the price at which the private equity firm re-sold the platform seven years later. A101 (¶182); A103 (¶186). Nothing about the Complaint's BondDesk allegations indicates that the four Defendants—or later Tradeweb—operated that platform so irrationally as to support an inference of conspiracy. To the contrary, Plaintiffs acknowledge that, under Tradeweb's management, the BondDesk platform (now Tradeweb Direct) "facilitates one in seven corporate bond trades." A104 (¶189).

**Pressure tactics**. Plaintiffs assert that two Defendants acted contrary to their individual interests by threatening to limit their business with First Tennessee if it continued to quote aggressive prices to BlackRock (Br. 35), but such means of "resisting competition" are "routine market conduct" that raise no inference of collusion. *Twombly*, 550 U.S. at 566. Moreover, two Defendants' alleged battles with First Tennessee over BlackRock's business have nothing to do with Plaintiffs' platform-boycott theory.

### 3. Plaintiffs' other plus-factor allegations are meritless.

Although Plaintiffs assert that "Defendants collectively control approximately 65% of the market for underwriting corporate bonds" (Br. 36 (citing A61 (¶79)), the

district court correctly held that the relevant market—the market for secondary trading of corporate bonds—is much too fragmented to provide a plus factor (A227-29). Plaintiffs ignore the district court's analysis of this issue.

Plaintiffs also contend that Defendants "frequently communicate" about corporate bonds (Br. 37 (citing A121 (¶¶237-241)), but the underlying factual allegations that *bond traders* often communicate about *bond trades* have nothing to do with a purported conspiracy to boycott electronic trading platforms. *See* A231-34 (explaining that communications about bond trades are irrelevant to platform-boycott conspiracy). Plaintiffs fare no better with their newly-minted assertion—not pled in the Complaint or argued below—that certain Defendants had "opportunities to conspire" arising from their ownership interests in Tradeweb and BondDesk. Br. 37. "The mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred." *Cap. Imaging Assocs., P.C.* v. *Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993).

## II.    Plaintiffs Rely on Impermissible Group Pleading.

"If the complaint indiscriminately groups the defendants together, it fails to comply with the minimum standard of Rule 8." *Joseph* v. *Bernstein*, 612 F. App'x 551, 555 (11th Cir. 2015). This Court thus has affirmed the dismissal of antitrust claims that plead conspiratorial conduct "in entirely general terms without any specification of any particular activities by any particular defendant." *In re Elevator*,

502 F.3d at 50. Indeed, "[c]onclusory allegations of participation in a conspiracy have long been held insufficient to state a claim." *Anderson News, L.L.C.* v. *Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012); *see In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009) (complaint must "specify how these defendants are involved in the alleged conspiracy" and cannot rely on "vague allegations" and "indeterminate assertions" against all "defendants").

To prevail on a conspiracy claim, "an antitrust plaintiff must present evidence" that each of the defendants, "in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective." *AD/SAT, Div. of Skylight, Inc.* v. *Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999). "[T]he complaint must forecast that factual showing, and if it fails to allege particular facts against a particular defendant, then the defendant must be dismissed." *SD3, LLC* v. *Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015). Without factual allegations "pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory" and "stops short of the line between possibility and plausibility of entitlement to relief." *Twombly*, 550 U.S. at 557; *see SD3*, 801 F.3d at 422 ("A plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group.").

Applying these principles, "[p]ost-*Twombly* authorities overwhelmingly hold that a complaint that provides no basis to infer the culpability of the *specific* defendants named in the complaint fails to state a claim." *In re Mexican Gov't Bonds Antitrust Litig.* ("*MGBs*"), 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019). To survive dismissal, "an antitrust complaint must provide some basis for inferring that the specific defendants participated in the alleged conspiracy." *Id.* at 389. "This required factual content must be pleaded with respect to each defendant." *Concord Assocs., L.P.* v. *Entm't Props. Tr.*, 2014 WL 1396524, at *22 (S.D.N.Y. 2014), *aff'd*, 817 F.3d 46 (2d Cir. 2016). If the complaint does not plead facts that "plausibly suggest that [any of] the *particular* defendants named in [the] suit were part of [the alleged] conspiracy," the action should be dismissed. *MGBs*, 412 F. Supp. 3d at 389. Even Plaintiffs acknowledge that "antitrust plaintiffs" must "allege as to each defendant facts that plausibly suggest that the defendant joined the conspiracy and played some role in it." Br. 46.

The district court correctly held that the Complaint "does not contain allegations as to any individual Defendant that would establish that [it] engaged in a group boycott." A235. As the court explained, "[t]he thrust of the Complaint is that Defendants were all among the largest underwriters of bonds" and that each "had an interest in preserving the market structure." *Id.* But "[t]he fact that a bank is large" does "not mean that it is an antitrust conspirator." A236. The court observed that

the "vast majority" of the allegations that refer to "specific Defendants" relate to their "lawful ownership interests in platforms." A239. "With regard to the actual boycott activity itself," however, "the Complaint is almost entirely devoid of allegations about any specific defendant." *Id.* Rather, the Complaint "refer[s] to Defendants as a collective bloc and assert[s] generalized claims of parallel conduct," without "connect[ing] any individual Defendant to the alleged conspiracy." *Id.*

Plaintiffs argue that "[t]he Complaint's statistical evidence shows that each Defendant imposed wider spreads" on "odd-lots trades than on round-lot trades" and that each thus had a "motive to conspire." Br. 47. But most of Plaintiffs' "statistical evidence" fails to distinguish Defendants from other dealers or refers to Defendants as a group. A68-76 (¶¶95-108). The Complaint's limited allegations of *individual* Defendants' spreads (A76-79 (¶¶109-112)) do not suggest collusion because they show a wide variation in Defendants' average spreads (A77-78 (¶111)), which "cuts against the inference Plaintiffs would draw of conspiracy" (A237). In any event, allegations of a motive to "capture[] greater profits" (Br. 47) are insufficient to plead participation in a conspiracy. *See In re Musical Instruments*, 798 F.3d at 1194 n.8.

Plaintiffs next contend that the Complaint alleges "refusals to deal" with platforms "that featured all-to-all trading of odd lots." Br. 47. But those allegations also refer generically to "Defendants" as a group. A96-99 (¶¶157-158, 163-164, 167, 169-171); A105 (¶190). General allegations that "Defendants" refused to deal

with these platforms are insufficient to connect each of the Defendants to a group boycott. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679.

Plaintiffs further assert that the Complaint alleges that nine Defendants invested in Tradeweb, one Defendant invested in MarketAxess, and four Defendants had representatives on the BondDesk board. Br. 47. But the Tradeweb and MarketAxess allegations that mention particular Defendants simply identify them as investors in those platforms, not as participants in a boycott. A91-94 (¶¶143, 147, 149, 151); A103 (¶186); A106 (¶193). The BondDesk allegations likewise do not plead that any Defendant joined a boycott; they allege only that four Defendants held ownership stakes in BondDesk between 2004 and 2006 (A100-02 (¶¶173-174, 182)) and that their board representatives participated in the decision to replace the platform's management (A100 (¶176)). The allegation that two Defendants with ownership stakes in BondDesk "led" the effort to replace its management does not plead participation in a boycott. A100-01 (¶¶176-182).

That leaves only a handful of substantive allegations—four of the Complaint's 283 paragraphs—that mention any Defendant by name. Plaintiffs cite (Br. 47-48) their allegation that Bank of America expressed an interest in participating on BondsPro but ultimately declined because of concern about "blowback" from "other

Defendants" (A99 (¶170)). But the Complaint pleads no facts suggesting that this allegation refers to anything other than Bank of America's unilateral concern—there are no accompanying allegations of related statements or conduct by any other Defendant. Plaintiffs also cite (Br. 16-17, 47) their allegations that Salomon Smith Barney "refused to do business" with InterVest traders in the 1990s and that Morgan Stanley and Citibank separately fought some sort of turf battle with First Tennessee for Blackrock's business between 2015 and 2019. A89-90 (¶¶137-139). Plaintiffs fail, however, to connect the latter allegation to their boycott theory or to tie the former allegation to their claim that Defendants conspired to shut down InterVest by complaining to Bloomberg (A90-91 (¶¶141-142)).

Ultimately, Plaintiffs appear to have selected the Defendants because they "were all among the largest underwriters" of corporate bonds. A235. They then allege that Defendants (like every other dealer) charged wider spreads for odd lots than for round lots and that many Defendants invested in different platforms. Beyond those allegations, the Complaint's allegations about particular Defendants "are sparse to the point of near non-existence." *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016). As the district court noted, in terms of "actual boycott activity," the Complaint "is almost entirely devoid of allegations about any specific defendant." A239. Because Plaintiffs "have not nudged" their boycott

claim against each of the Defendants "across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## III. Plaintiffs' Claim Is Untimely.

The district court correctly held that the four-year statute of limitations bars Plaintiffs' claim. Because Plaintiffs did not commence this action until April 21, 2020, any claim based on conduct that occurred before April 21, 2016 is time-barred. Plaintiffs cannot rely on the continuing-violation doctrine or fraudulent concealment to extend the limitations period.

### A. Plaintiffs Allege No Overt Boycott Act After April 2016.

"The basic rule is that damages are recoverable under the federal antitrust acts only if suit therefor is commenced within four years after the cause of action accrued." *Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). Under the continuing-violation doctrine, however, "each overt act that is part of the violation and that injures the plaintiff" starts the limitations period running again. *Klehr* v. *A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). Plaintiffs here cannot avail themselves of that doctrine because they do not plead a single overt act in furtherance of the alleged boycott conspiracy that occurred after April 2016.

Plaintiffs argue that they have alleged a continuing conspiracy based on Defendants' corporate-bond transactions after April 2016 at prices that supposedly were still affected by the purported boycott. Br. 50-53. If that argument were

correct, the statute of limitations for a boycott claim could extend *indefinitely*. The district court correctly held, however, that each transaction "at an inflated price is not part of the antitrust violation—the boycott—but rather merely an effect of the antitrust violation," which does not restart the limitations period. A241. In contrast to a price-fixing conspiracy, where "each 'fixed' price is itself an overt act that is part of the antitrust violation," the court stated, "higher prices are not the conspiracy itself" in a boycott, only the "effects" of the conspiracy. *Id.*

As this Court explained, "when [an] anticipated economic benefit continues," the "payment[s] [are] the *result* of a completed conspiracy," and "not in furtherance of one that is ongoing." *United States* v. *Grimm*, 738 F.3d 498, 503-04 (2d Cir. 2013). "[T]he result of [the] conspiracy may be continuing," but "the conspiracy does not thereby become a continuing one." *Id.* A continuing conspiracy instead requires "[c]ontinuity of action to produce the unlawful result, or continuous co-operation of the conspirators to keep it up." *Id.* The allegedly inflated prices charged by Defendants after April 2016 were the "anticipated economic benefit" of the alleged boycott, but they did not depend on "continuous co-operation" among Defendants. Any post-April 2016 inflated prices thus were "merely the abatable but unabated inertial consequences of [Defendants'] pre-limitations" period conduct. *Poster Exch., Inc.* v. *Nat'l Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir. 1975).

This Court's decision in *US Airways, Inc.* v. *Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019), is dispositive. The Court there held that each inflated payment under a 2006 contract that violated the Sherman Act "was not an overt act of its own, but a manifestation of the prior overt act of entering into the 2006 contract." *Id*. at 69. Plaintiffs attempt to distinguish *Sabre* on the ground that the plaintiffs there "could have sued immediately in 2006, and could have proved" future damages "based on the contracts terms," whereas Plaintiffs here "could not have proved" any injury based on post-April 2016 trades before those trades occurred. Br. 53. But *Sabre* was not decided on that basis. This Court framed the issue as follows: "whether a defendant commits an 'overt act' each time a plaintiff pays a defendant a supracompetitive price pursuant to a contract that violates the Sherman Act?" 938 F.3d at 68. The Court answered that question "no" because any transaction during the limitations period was "a manifestation of the prior overt act of entering into the 2006 contract," not "an independent overt act of its own." *Id*. at 69.

The same is true here. "[E]ach supracompetitive price" supposedly charged by Defendants after April 2016 "was not an overt act on its own, but a manifestation of the prior overt act[s]" of the alleged boycott—all of which occurred before April 2016. *Id*. at 68-69. Plaintiffs do not allege that Defendants agreed to charge certain prices or that charging "inflated prices" furthered or maintained the alleged boycott. Plaintiffs instead contend that higher prices were the "effect" of the alleged

boycott. A124 (¶254) ("effect" of boycott was to allow Defendants to earn "supracompetitive profits").

The pre-*Sabre* cases Plaintiffs cite (Br. 51) are outdated and distinguishable. In *Borger* v. *Yamaha International Corp.*, 625 F.2d 390, 398 (2d Cir. 1980), the Court addressed whether a plaintiff can recover damages incurred through trial as a result of an ongoing refusal to deal, not what conduct constitutes an overt act that is part of a continuing violation. In *Andrea Theatres, Inc.* v. *Theatre Confections, Inc.*, 787 F.2d 59, 65 (2d Cir. 1986), the Court reversed the dismissal of a case on abstention grounds, and then found that it "cannot conclude that [the complaint] is so patently insufficient as to warrant exercising our supervisory power to direct that it be dismissed regardless of the absence of an appealable order." And in *Ansul Co.* v. *Uniroyal, Inc.*, 448 F.2d 872, 884-85 (2d Cir. 1971)—decided over 50 years ago— the Court found a claim timely because the terminated distributor continued to be harmed by the defendant's *ongoing* antitrust violations during the limitations period, including the defendant's refusal to reinstate the distributor. None of these cases supports Plaintiffs' contention that each of Defendants' transactions was an overt boycott act that restarts the limitations period.

Finally, Plaintiffs argue that two Defendants allegedly "punish[ed] First Tennessee during the period from 2015 to 2019" for quoting aggressive prices to BlackRock. Br. 53. But the Complaint fails to specify that this isolated conduct

occurred *after* April 2016. A89-90 (¶¶138-139). In any event, Plaintiffs' allegations that two Defendants skirmished with First Tennessee over BlackRock's business has no connection to Plaintiffs' boycott theory.

### B.    Plaintiffs Fail to Plead Fraudulent Concealment.

To plead fraudulent concealment, Plaintiffs must allege with particularity that (i) Defendants concealed the existence of their claim from them, (ii) Plaintiffs remained ignorant of their claim until some point within four years of filing suit, and (iii) this continuing ignorance was not attributable to a lack of diligence. *See Koch* v. *Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012). Plaintiffs fail to allege any of these elements, much less all three.

### 1.    Plaintiffs fail to plead concealment.

To plead concealment, Plaintiffs must allege with the specificity required by Rule 9(b) that Defendants wrongfully concealed material facts from them that prevented them from discovering their claim within the limitations period. *See id.*; *Corcoran* v. *N.Y. Power Auth.*, 202 F.3d 530, 543 (2d Cir. 1999). The district court correctly held that the Complaint does not satisfy this standard. A243-45. Plaintiffs' three arguments on appeal are unavailing.

*First*, Plaintiffs argue that employees of two Defendants "who forced out the management of BondDesk gave a false explanation" for this management change. Br. 54 (citing A100-01 (¶¶176-181)). But Plaintiffs do not allege that those

employees' statements as BondDesk directors dissuaded *Plaintiffs* from filing an action within the limitations period. *See Koch*, 699 F.3d at 157 (no fraudulent concealment where allegations "do not indicate how [defendant] prevented [plaintiff] from discovering his claim"). Plaintiffs further contend that "Defendants' use of their ownership positions in TradeWeb and MarketAxess" to block an "all-to-all trading model" was "concealed." Br. 54. As the district court stated, however, "Plaintiffs do not allege that Defendants' ownership interests" in "TradeWeb and MarketAxess were hidden," and the nature of those firms' trading platforms "would have been readily apparent to the public." A245.

*Second*, Plaintiffs assert that they allege that Defendants communicated "in secret" (Br. 55), citing their allegations that traders discussed "bond pricing" (A121 (¶241)) using "channels that are unavailable to the public" (A126 (¶260)). But Plaintiffs nowhere address why trader communications about *bond pricing* concealed the alleged conspiracy to boycott *trading platforms*, and conclusory allegations about non-public communications do "not satisfy the specificity requirements of Rule 9(b)." *Armstrong* v. *McAlpin*, 699 F.2d 79, 90 (2d Cir. 1983).

*Third*, Plaintiffs argue that Defendants "promulgated corporate codes of conduct that disclaimed unlawful and anticompetitive conduct." Br. 55. But Plaintiffs cite codes of conduct that were published in 2020, not during the period they seek to have tolled. A126-30 (¶263). They also do not allege that they relied

on any statements in those codes in deciding not to assert their claim before April 2016. Regardless, this Court has held that "Code[s] of Ethics are a textbook example of 'puffery'" that "do not invite reasonable reliance." *Singh* v. *Cigna Corp.*, 918 F.3d 57, 60-63 (2d Cir. 2019).

### 2. Plaintiffs were on inquiry notice.

A plaintiff cannot invoke fraudulent concealment if it was on inquiry notice more than four years before filing its complaint. *See Corcoran*, 202 F.3d at 543 (tolling unavailable when plaintiff "knew, or should have known, the nature of his claim within the statutory period").

The Complaint establishes that Plaintiffs were on inquiry notice well before April 2016. Every single acquisition of ownership stakes and platform failure discussed in the Complaint occurred in plain view and was publicly reported before April 2016, including in the news articles cited in the Complaint. *See* A92-105 (nn.25-46). In light of "the public nature of the information upon which [Plaintiffs] base their claims," the Complaint cannot plead fraudulent concealment. *Allen* v. *Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 347-48 (D. Vt. 2010); *see also IRS*, 261 F. Supp. 3d at 489 n.38 (claims time-barred where "plaintiffs based their [claims] on voluminous news articles and other public sources, many published well before" the statutory period).

In addition, Plaintiffs cannot reconcile their claim of ignorance with their allegations that only a boycott can explain widely reported market developments. The Complaint alleges that "[t]he fact that electronic trading platforms" are "open to institutional investors, but not retail investors, defies any economic, competitive justification" (A108 (¶203)) and that the lack of platforms open to retail investors "is clear evidence that Defendants agreed to stop the emergence" of such platforms (A106 (¶195)).  Those allegations alone are sufficient for inquiry notice.  *See IRS*, 261 F. Supp. 3d at 489 ("[A]ccepting class plaintiffs' premise that only a plot can explain the missing platforms, class plaintiffs have every basis, in real time, to smell a rat.  At a minimum they were on inquiry notice.").

Plaintiffs contend that the Complaint "alleges that Plaintiffs did not know of Defendants' conspiracy and could not have learned of it earlier through reasonable diligence."  Br. 55 (citing A125 (¶259); A131 (¶264)).  But those "conclusory allegations" are insufficient to plead ignorance.  *Armstrong*, 699 F.2d at 88; *see also Zirvi* v. *Flatley*, 838 F. App'x 582, 587 (2d Cir. 2020) ("[C]onclusory claims that they could not have discovered the [misconduct] through the exercise of diligence" lack "particularity and are unavailing").  Plaintiffs further note that the Complaint "relies on expert analysis of Defendants' trades" to show that spreads for odd lots were wider than those for round lots.  Br. 55.  Not only could that analysis have been

completed earlier, but the Complaint also cites multiple academic studies published before April 2016 discussing the same pricing disparity. A65-67 (¶¶89-90).

Plaintiffs identify only *two* boycott allegations (the purported reason for removing BondDesk's management in 2004 and the statement attributed to Bank of America in 2012 or 2013) that "do not rely on publicly available information." Br. 56. To be on inquiry notice, however, a plaintiff "need not know each and every relevant fact …. Rather, a claim will accrue when the plaintiff knows, or should know, enough of the critical facts" to "seek[] legal advice." *Kronisch* v. *United States*, 150 F.3d 112, 121 (2d Cir. 1998). Under that standard, Plaintiffs clearly were on inquiry notice.

Plaintiffs also cannot "simultaneously claim[] that the generalized evidence cited as the basis of [their] complaint—the vast majority of which involves factual allegations published prior to [April 2016]—is sufficiently detailed to state a cognizable claim for relief and that, nevertheless, these facts were somehow insufficiently particular to cause the statute of limitations to run." *Woori Bank* v. *Merrill Lynch*, 923 F. Supp. 2d 491, 495-96 (S.D.N.Y.), *aff'd*, 542 F. App'x 81 (2d Cir. 2013). Plaintiffs cannot have it both ways: either their allegations based on information that was publicly available years ago are insufficient to state a claim or Plaintiffs were on inquiry notice before April 2016. *See Fire & Police Pension Ass'n of Colo.* v. *Bank of Montreal*, 368 F. Supp. 3d 681, 708-09 (S.D.N.Y. 2019).

Ignoring these cases, Plaintiffs argue that "the district court's reasoning contradicts itself" because the court held both that the Complaint does not plead a plausible conspiracy and that Plaintiffs were on inquiry notice before April 2016. Br. 57. There is no contradiction: inquiry notice does not require that a plaintiff have sufficient factual information to state a claim. *See Pearl* v. *Long Beach*, 296 F.3d 76, 84-85 (2d Cir. 2002). Instead, "all that is necessary to cause the tolling period to cease is for there to be reason to suspect the probability of any manner of wrongdoing." *131 Maine St. Assocs.* v. *Manko*, 179 F. Supp. 2d 339, 348 (S.D.N.Y.), *aff'd*, 54 F. App'x 507 (2d Cir. 2002). It thus can be true both that Plaintiffs' allegations are insufficient to state a claim and that the available public information was enough to put Plaintiffs on inquiry notice.

### 3. Plaintiffs fail to plead due diligence.

A plaintiff also must have "exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Koch*, 699 F.3d at 157. Plaintiffs do not identify a single step they took to investigate their potential claim before April 2016, nor do they explain what previously unavailable information became available after April 2016 that enabled them to file this lawsuit in April 2020. *See* A125-31 (¶¶259-265). Without this information, "it is impossible to discern whether Plaintiffs could or should have discovered [their claim] within the limitations period." *In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090,

at *25 (D.N.J. 2011). Plaintiffs thus fail to plead the exercise of diligence throughout the pre-April 2016 tolling period.

## IV. Plaintiffs Do Not Plead Antitrust Injury.

To plead antitrust injury, a plaintiff must allege that it suffered an "actual injury" caused by the alleged violation. *Harry* v. *Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 115-16 (2d Cir. 2018). Yet Plaintiffs do not allege that they, or a broker or advisor acting on their behalf, ever sought to trade on a platform but were denied access. The Complaint instead acknowledges that institutional investors, like Plaintiff UFCW, had direct access to "three electronic trading platforms" that "allow investor-to-investor direct trading" and offer "pre-trade pricing transparency" resulting "in better competition on pricing and lower transaction costs" (A107 (¶198)) and that retail investors, like the other Plaintiffs, had indirect access to those same platforms (A104 (¶¶188-189)). The district court thus correctly held that the Complaint does not adequately plead "that Plaintiffs suffered any antitrust injury stemming from the alleged group boycott." A248.

Plaintiffs criticize the district court for focusing "on allegations at the beginning and end" of the Complaint. Br. 58-59. The district court, however, cannot be faulted for concentrating on the two paragraphs Plaintiffs cited in opposing Defendants' motion (A35-36 (¶2); A38-39 (¶10)) and the only paragraph of the Complaint labeled "antitrust injury" (A125 (¶258)). Nor can Plaintiffs find support

in the three additional paragraphs they cite for the first time on appeal. Br. 58 (citing A79-81 (¶¶113-115)). Those paragraphs simply compare prices for certain odd-lot transactions by Plaintiffs to average prices for round-lot transactions in the same security on the same day. Plaintiffs plead *no* facts suggesting that the alleged differences between their odd-lot prices and average round-lot prices actually was caused by a group boycott.

## V.   There Are No Grounds for Vacating the Judgment.

Plaintiffs argue that the judgment should be vacated because, "[w]hen the district court dismissed the Complaint with prejudice, Judge Liman's wife owned stock in Bank of America." Br. 60. The premise for that argument is incorrect: Judge Liman's wife "fully divested" her stockholding "in July 2021," approximately two months before oral argument on Defendants' motion to dismiss and three months before the court dismissed the case. SA265. In a similar case, the Ninth Circuit, sitting *en banc*, held that this alone disposes of a claimed violation of Section 455: "Because [the judge] had no reportable financial interest at the time of the ruling in question, [the judge's] prior financial interests in [the entities] were not disqualifying," and "no reasonable person informed of all the relevant facts would consider that" the judge ruled "on any basis other than the merits." *Olean Wholesale Grocery Coop., Inc.* v. *Bumble Bee Foods LLC*, No. 19-56514, at 4-5 (9th Cir. Apr. 8, 2022), ECF No. 185. Furthermore, this Court's *de novo* review of the district

court's ruling ensures that no injustice will occur here and renders any recusal failure harmless. Plaintiffs' argument for vacatur thus is meritless.

## A. Plaintiffs Have Not Shown a Violation of Section 455.

Contrary to Plaintiffs' contention (Br. 60), the district court did not violate Section 455(b)(4) or (a). Section 455(b)(4) is triggered only if the judge actually "knows" of a disqualifying financial interest while presiding over the case. Plaintiffs point to no facts suggesting that Judge Liman knew about his wife's prior stockholding until about four months *after* he dismissed the Complaint and the case was on appeal. The chronology suggests that Judge Liman first became aware of his wife's stockholding in February 2022, when *The Wall Street Journal* inquired about his wife's investments.[4] The Clerk then notified the parties that "it has been brought to [Judge Liman's] attention that while he presided over the case his wife owned stock in Bank of America." SA263.

Nor have Plaintiffs established a violation of Section 455(a). Plaintiffs argue that, even if Judge Liman was unaware of his wife's stockholdings while presiding over the case, he violated Section 455(a) because his "impartiality might reasonably be questioned." Br. 60. To establish a violation of Section 455(a), however, Plaintiffs must demonstrate that (i) "a reasonable person, knowing all the facts,

---

[4] James V. Grimaldi, *Fallout From Judges' Financial Conflicts Spreads to Appeals Courts*, WALL ST. J., Mar. 1, 2022 ("Judge Liman asked a clerk to file notices" about potential conflicts "after an inquiry last month from the *Journal*.").

would conclude that the judge had a disqualifying interest in a party under Section 455(b)(4)," and (ii) "such a person would also conclude that the judge knew of that interest and yet heard the case." *Chase Manhattan Bank* v. *Affiliated FM Ins. Co.*, 343 F.3d 120, 128 (2d Cir. 2003). The record does not support the conclusion that Judge Liman knew of his wife's stockholding and yet heard the case anyway.

Plaintiffs argue that, even if Judge Liman "did not actually know, he had a duty to inform himself under § 455(c), which an objective member of the public would assume that he followed." Br. 60. In effect, Plaintiffs contend that Section 455(c) creates a *per se* rule that requires "mandatory" vacatur if a judge fails to discover a potential conflict. The case-law, however, rejects Plaintiffs' *per se* rule, instead holding that disqualification turns on the specific facts of each case. *See Chase Manhattan Bank*, 343 F.3d at 130 ("We hold that *under the present facts* the district judge's stated ignorance … cannot overcome the objective appearance of a conflict of interest requiring disqualification under Section 455(a).") (emphasis added); *In re McCarthey*, 368 F.3d 1266, 1269 (10th Cir. 2004) ("There must be a reasonable factual basis to question the judge's impartiality."). The record here does not support a violation of Section 455(a).

## B.     Even If Section 455 Was Violated, Vacatur Is Unwarranted.

Not every violation of Section 455 requires vacatur of the judgment. "As in other areas of the law, there is surely room for harmless error committed by busy

judges who inadvertently overlook a disqualifying circumstance.  There need not be a draconian remedy for every violation of § 455(a)."  *Liljeberg* v. *Health Servs. Acquisition Corp.*, 486 U.S. 847, 862 (1988).  In determining whether to vacate a judgment, this Court considers:  "(i) the risk of injustice to parties in the particular case; (ii) the risk that denial of relief will produce injustice in other cases; and (iii) the risk of undermining the public's confidence in the judicial process."  *United States* v. *Amico*, 486 F.3d 764, 777 (2d Cir. 2007).  None of these factors supports vacatur here.

*First*, there is no risk of injustice to any party.  Although Plaintiffs disagree with the district court's decision and attempt to impugn the court's objectivity (Br. 61), disagreement with a ruling is not a basis to claim injustice.  *See*, *e.g.*, *Moskovits* v. *Moskovits*, 150 F. App'x 101, 102 (2d Cir. 2005) ("Plaintiffs have failed to show a basis for recusal" as "opposed to disagreement with decisions made by Judge Daniels").  In addition, no injustice to a party can occur here because this Court reviews motion-to-dismiss rulings *de novo*.  *See Brock* v. *Zuckerberg*, 2022 WL 1231044, at *4 (2d Cir. 2022) ("[T]he risk of injustice to the parties is exceedingly low" because "we review the question whether plaintiff has alleged a legally sufficient claim anew, without any deference to Judge Liman's assessment."); *Marcus* v. *Smith*, 755 F. App'x 47, 52 (2d Cir. 2018) ("[T]he judgment was appropriately entered on the merits.  Thus, there is no risk of injustice

to the parties in this case if relief is denied."); *Faulkner* v. *Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 42 n.10 (2d Cir. 2005) ("Given our disposition of the Faulkner appellants' claims, Judge Kaplan's denial of the recusal motion was at most harmless error as to them.").

*Second*, there is no risk that denial of relief will produce injustice in other cases. To be sure, this Court has recognized that a "[w]illingness to enforce § 455 may prevent a substantive injustice in some future case by encouraging a judge" to "more carefully examine possible grounds for disqualification." *Brock*, 2022 WL 1231044, at *3. But no court has ever held that this factor mandates vacatur whenever Section 455 is violated. Such a rule would not make sense here because Judge Liman's wife divested her stockholding before the court made any substantive rulings. Although Plaintiffs note the recurring problem of judges' participation in cases involving companies in which they or their families owned stock (Br. 62), Congress recently adopted appropriate measures to address that problem.[5] There is no basis for an inflexible judicial rule requiring vacatur of the judgment whenever Section 455 is violated, which could result in vacatur in dozens of cases and needlessly add to the judiciary's burdens.

---

[5] *See* Courthouse Ethics & Transparency Act, Pub. L. No. 117-125, 136 Stat. 1205, 1206.

*Third*, this Court's "*de novo* review of the viability of [the Complaint] alleviates any risk that the public's confidence in the judicial process will be undermined by the alleged conflict." *Marcus*, 755 F. App'x at 52. Plaintiffs argue that "this Court should not adopt a rule that would render § 455 meaningless at the motion-to-dismiss stage." Br. 63. But that is just another way of insisting on the same *per se* rule the Supreme Court rejected in holding that "[a] conclusion that a statutory violation [of Section 455] occurred does not" end the inquiry into the appropriate remedy. *Liljeberg*, 486 U.S. at 862. Given that Judge Liman's wife divested her stockholding before the court heard argument and ruled on Defendants' motion to dismiss, Plaintiffs' *per se* rule would not promote public confidence in the judiciary. *See Patterson* v. *Mobil Oil Corp.*, 335 F.3d 476, 486 (5th Cir. 2003) ("[T]he public may be more inclined to lose faith in the system if this court were to mindlessly vacate Judge Cobb's rulings.").

## CONCLUSION

The judgment should be affirmed.

Dated:  June 7, 2022

/s/ Richard C. Pepperman II
RICHARD C. PEPPERMAN II
MATTHEW J. PORPORA
JONATHAN S. CARTER
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
peppermanr@sullcrom.com
porporam@sullcrom.com
carterjo@sullcrom.com

*Attorneys for Defendants-Appellees*
*The Goldman Sachs Group, Inc. and*
*Goldman Sachs & Co. LLC*

/s/ Adam S. Hakki
ADAM S. HAKKI
RICHARD F. SCHWED
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York  10022
Telephone:  (212) 848-4000
Facsimile:  (212) 848-7179
adam.hakki@shearman.com
rschwed@shearman.com

*Attorneys for Defendants-Appellees*
*Bank of America Corporation; BofA*
*Securities, Inc.; and Merrill Lynch,*
*Pierce, Fenner & Smith Incorporated*

/s/ Barry G. Sher
BARRY G. SHER
KEVIN BROUGHEL
PAUL HASTINGS LLP
200 Park Avenue
New York, New York  10166
Telephone:  (212) 318-6085
Facsimile:  (212) 230-5185
barrysher@paulhastings.com
kevinbroughel@paulhastings.com

*Attorneys for Defendant-Appellee*
*Barclays Capital Inc.*

/s/ Jay Kasner
JAY KASNER
KAREN M. LENT
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, New York  10001
Telephone:  (212) 735-3276
Facsimile:  (917) 777-3276
jay.kasner@skadden.com
karen.lent@skadden.com

*Attorneys for Defendants-Appellees*
*Citigroup Inc. and Citigroup Global*
*Markets Inc.*

/s/ Herbert S. Washer

HERBERT S. WASHER
SHEILA C. RAMESH
ADMAN S. MINTZ
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York  10005
Telephone:  (212) 701-3000
hwasher@cahill.com
sramesh@cahill.com
amintz@cahill.com

*Attorneys for Defendant-Appellee
Credit Suisse Securities (USA) LLC*


/s/ Robert D. Wick

ROBERT D. WICK
JOHN S. PLAYFORTH
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, N.W.
Washington D.C.  20001
Telephone:  (202) 662-6000
Facsimile:  (202) 662-6291
rwick@cov.com
jplayforth@cov.com

*Attorneys for Defendants-Appellees
JPMorgan Chase & Co. and J.P.
Morgan Securities LLC*

/s/ John F. Terzaken

JOHN F. TERZAKEN
ADRIENNE V. BAXLEY
SIMPSON THACHER & BARTLETT
LLP
900 G Street, NW
Washington, DC  20001
Telephone:  (202) 636-5000
Facsimile:  (202) 636-5502
john.terzaken@stblaw.com
adrienne.baxley@stblaw.com

*Attorneys for Defendant-Appellee
Deutsche Bank Securities Inc.*


/s/ Richard A. Rosen

RICHARD A. ROSEN
BRAD S. KARP
SUSANNA BUERGEL
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON, LLP
1285 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 373-3305
Facsimile:  (212) 492-0305
rrosen@paulweiss.com
bkarp@paulweiss.com
sbuergel@paulweiss.com

KANNON K. SHANMUGAM
JANE B. O'BRIEN
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON, LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 223-7300
Facsimile: (202) 223-7420
kshanmugan@paulweiss.com
jobrien@paulweiss.com

*Attorneys for Defendants-Appellees
Morgan Stanley; Morgan Stanley &
Co., LLC; and Morgan Stanley Smith
Barney LLC*

/s/ Paul S. Mishkin

PAUL S. MISHKIN
ADAM G. MEHES
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4292
paul.mishkin@davispolk.com
adam.mehes@davispolk.com

*Attorneys for Defendant-Appellee
NatWest Markets Securities Inc.*

/s/ Jayant W. Tambe

JAYANT W. TAMBE
LAURA W. SAWYER
JONES DAY
250 Vesey Avenue
New York, New York 10281
Telephone: (212) 326-3604
jtambe@jonesday.com
lwsawyer@jonesday.com

*Attorneys for Defendants-Appellees
Wells Fargo & Co.; Wells Fargo
Securities LLC; and Wells Fargo
Clearing Services LLC*

**CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that this document complies with Local Rule 32(a)(4)(A) because this document contains fewer than 14,000 words. This document contains 13,998 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). The undersigned further certifies that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman 14-point font.


June 7, 2022                                        /s/ Richard C. Pepperman II
                                                    Richard C. Pepperman II

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2022, I caused the foregoing Joint Brief of Defendants-Appellees and accompanying Supplemental Appendix to be filed electronically using the Court's CM/ECF system. I further certify that all participants in the case are registered CM/ECF users, and that service on all parties will be accomplished electronically by the CM/ECF system. I further certify that I caused six paper copies of the Joint Brief and Supplemental Appendix to be delivered to the Court by overnight hand delivery.


 /s/ Richard C. Pepperman II
Richard C. Pepperman II